NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (Cal. Bar No. Pending)
Assistant United States Attorney
Asset Forfeiture Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2426
     Facsimile: (213) 894-0142
     E-mail:   Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CV 20-9701 |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. § 981(a)(1)(C) |
| $246,000 SEIZED FROM SIGNATURE BANK ACCOUNT '5022, and $41,928 SEIZED FROM SIGNATURE BANK ACCOUNT '50520, | [U.S.S.S.] |
| Defendants. | |

The United States of America brings this claim against the above-captioned defendants, and alleges as follows:

**JURISDICTION AND VENUE**

1.  This is a civil forfeiture action brought pursuant to 18 U.S.C. §§ 981 (a)(1)(C).

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this District pursuant to 28 U.S.C. § 1395(a).

**PERSONS AND ENTITIES**

4. The plaintiff is the United States of America ("plaintiff" or the "government").

5. The defendants are:

   a. $246,000.00 seized from Signature Bank account ending '5022 (the "Signature '5022 Account"); and

   b. $41,928.00 seized from Signature Bank account ending '0520 (the "Signature '0520 Account") (collectively, the "Defendant Funds").

6. The Defendant Funds were seized by agents of the United States Secret Service ("USSS") in this district on or about June 5, 2020, pursuant to a seizure warrant issued by the Hon. Karen L. Stevenson, United States Magistrate Judge.

7. The Defendant Funds are currently in the custody of the United States Secret Service, where they shall remain subject to this Court's jurisdiction pending this action.

8. The interests of "M.M." (as defined herein), Artur Hiaeve, Alexandra Hiaeve, David Hiaeve, and Avi & Co. NY Corp. may be adversely affected by these proceedings.

**EVIDENCE SUPPORTING FORFEITURE**

*Background on Romance and Confidence Frauds*

9. Confidence frauds occur when a victim transfers money and/or property as a result of being deceived or misled by a criminal. Romance frauds are a type of confidence fraud wherein a

criminal typically adopts a fake identity to gain a victim's affection and trust, and then uses the illusion of a romantic or close relationship to manipulate and/or steal from the victim. Currently, confidence and romance frauds often occur through the internet because it affords fraudsters anonymity, the ability to create multiple false identifies easily, and the freedom to operate between different legal jurisdictions.

10. Social engineering is a method used by criminals to manipulate confidence and romance fraud victims into performing certain actions or providing confidential information. When successfully executed, social engineering techniques can cause a victim to send money to someone whom he or she met on a dating website or to provide confidential information such as his or her personal identifiable information and bank account information.

11. Individuals committing confidence or romance frauds will often send victims "good faith" payments that are fraudulent in nature. The fraudsters will then request that those good-faith funds be transferred to another bank account, in effect using the victim to launder money, or ask the victim to hold the funds as collateral, in order to give the victim false comfort and lure him or her deeper into the scheme.

### *Evidence Supporting Forfeiture*

12. M.M. is an individual residing in Santa Monica, California. M.M. is retired, and was widowed in or about April of 2019.

13. Following the death of her spouse, M.M. began seeking new relationships through online dating. In or about September 2019, M.M. was contacted by an unidentified individual using the name "Robert Ankeny" (hereinafter "UI-1") on the dating website Match.com. Over

3

the next several months, M.M. and UI-1 began an online relationship. M.M. and UI-1 never met in person or communicated via live video chat applications or software, and only communicated through telephone conversations, text messages, Skype messages and emails.

14. M.M. sent or received substantially all of these communications with UI-1 while present in Los Angeles County, California.

15. In fact, UI-1 had misappropriated the identity of Robert Ankeny, a real person believed to reside in Pennsylvania. At no time was the real Robert Ankeny in communication with M.M.

16. In the course of these electronic communications, UI-1 represented to M.M. that he was traveling to Turkey to begin construction of a hospital. In or about November of 2019, UI-1 asked M.M. to help him financially with funding the construction efforts of the hospital, stating to M.M. that his own funds for the project were stuck in a Turkish bank, and that he was unable to access them. Based on UI-1's representations, M.M. wired $20,000 to a bank account provided by UI-1.

17. In or about the same period in November 2019, M.M. received a $25 million check addressed to "Robert Ankeny" via the United States Postal Service ("USPS"). UI-1 represented to M.M. that the check was a partial payment for the purported hospital construction in Turkey, but that he could not deposit it into any Turkish financial institutions, and requested M.M. hold onto the check for him. M.M. was directed by UI-1 only to hold the check, and not to attempt to deposit the funds.

18. As described above, the sending of "good faith money" is a common ruse used by criminals perpetrating confidence or romance

4

frauds to lull a victim and abate suspicion. The idea is to appear to transfer a large amount of money to the victim for safekeeping, in order to convince the victim that the fraudster has more than enough money and that the victim need not worry about being defrauded. In reality, the good faith money is often illusory or does not actually belong to the fraudster. In M.M.'s case, the check sent by UI-1 was ultimately determined not to be valid.

19. Shortly after the above-mentioned $20,000 wire transfer, UI-1 told M.M. that he had been arrested by Turkish officials following a construction accident. UI-1 claimed to be incarcerated, but stated that he was able to communicate with M.M. via his mobile telephone and email, and sent her a photograph purporting to show himself in jail.

20. During the time period she was communicating with UI-1, in or about October 2019, M.M. also was contacted through Match.com by another currently-unidentified individual using the name "Sean Buck" or "Scott Buck" (hereinafter "UI-2"). During the course of their conversations, UI-2 represented to M.M. that he was an Admiral with the United States Navy, and was stationed on an aircraft carrier in the Middle East. M.M. never met UI-2 in person and only communicated with UI-2 electronically, but stated that in some instances she and UI-2 communicated via live chat on Skype, and that during these chats UI-2 would always appear to be dressed in a military uniform.

21. M.M. sent or received substantially all of these communications with UI-2 while present in Los Angeles County, California.

22. In fact, UI-2 had misappropriated the identity of Sean Buck, a real person and active duty officer in the United States Navy. At no time was the real Sean Buck in communication with M.M.

23. While M.M. believed she was communicating with UI-2 via live chat on Skype, what she was seeing were actually manipulated clips of preexisting publicly-available video of the real Admiral Buck, and not the live video chats that M.M. believed them to be. This technique is often associated with a practice known as "deep fake" videos, where preexisting video footage is altered to create the appearance that the subject pictured is saying or doing things different from that captured in the original video footage.

24. Upon being told of UI-1's purported arrest by Turkish authorities in or about November of 2019, M.M. told UI-2 about UI-1 and what had purportedly happened to him while in Turkey. UI-2 represented to M.M. that he could use military resources to determine what had happened to UI-1. Days later, UI-2 responded to M.M. stating that he had confirmed that UI-1 had indeed been arrested, and that he (UI-2) wanted to assist in getting UI-1 released from Turkish jail. UI-2 stated that to obtain UI-1's release, M.M. needed to liquidate any financial instruments she may have and begin sending the money to accounts identified by UI-2.

25. In fact, UI-2's representations were materially false, as UI-2 was not Sean Buck, had no military resources to deploy, and funds sent by M.M. to accounts designated by UI-2 would not be used to obtain the release of UI-1, or anyone else, from Turkish prison.

26. Believing that UI-1 was in danger, and believing UI-2's representation that he could help UI-1, M.M. began to wire money to financial institutions located in Turkey and the United States. M.M.

ultimately initiated at least seven wire transfers originating from bank accounts M.M. controlled at JP Morgan Chase Bank and Wells Fargo Bank. Of the seven wire transfers, three were to Valley National bank ("VNB"), a domestic financial institution in the United States (the "Domestic Transfers"):

27. UI-2 represented to M.M that the Domestic Transfers would go to accounts of a lawyer in New York who would forward the funds to Turkey to aid in securing UI-1's release.

28. The Domestic Transfers were made into a VNB checking account ending in '5107 (the "VNB '5107 Account"), held in the name of AVI & CO. NY Corp. Specifically:

    a. On or about December 27, 2019, M.M. wired $200,000.00 from her JP Morgan Chase Bank checking account to the VNB '5107 Account.

    b. On or about December 31, 2019, M.M. wired $46,000 from her JP Morgan Chase Bank checking account to the VNB '5107 Account.

    c. On or about January 17, 2020, M.M. wired $41,928.00 from her Wells Fargo Bank checking account the VNB '5107 Account.

29. In total, M.M. wired $287,928.00 to the VNB '5107 Account (the Defendant Funds).

30. Between December 30, 2019 and January 22, 2020, the Defendant Funds were transferred from the VNB '5107 Account to the Signature '5022 Account:

    a. On or about December 30, 2019, $359,580 from the VNB '5107 Account was paid by check to the Signature '5022 Account. This included the funds from M.M.'s $200,000 wire transfer.

7

   b. On or about January 6, 2020, $511,000 from the VNB '5107 Account was paid by check to the Signature '5022 Account. This included the funds from M.M.'s $46,000 wire transfer.

   c. On or about January 22, 2020, $79,706.49 from the VNB '5107 Account was paid by check to the Signature '0522 Account. This included the funds from M.M.'s $41,928 wire transfer.

 31. After sending the wire transfers and speaking with her son, M.M. became concerned that she may have been defrauded. M.M. contacted JP Morgan Chase and Wells Fargo and attempted to recall the wire transfers. One wire transfer from JP Morgan Chase was successfully recalled.

 32. When M.M. informed UI-2 that she had become concerned and was trying to recall the wires, UI-2 became angry and repeatedly attempted to contact M.M. and demand funds. UI-2 represented to M.M. he never received certain transfers M.M. had initiated, however, M.M.'s bank records show this transfer was successfully executed.

 33. In or about February 2020, M.M. was still receiving communications from both UI-1 and UI-2. Each continued to request that M.M. send them additional money, but M.M. refused. Both UI-1 and UI-2 represented that they would repay M.M. all of her money once they returned to the United States. To date, none of the funds (other than the Defendant Funds) have been recovered or returned.

//

//

//

**FIRST CLAIM FOR RELIEF**

18 U.S.C. § 981(a)(1)(C)

34. Based on the facts set out above, Plaintiff alleges that the Defendant Funds constitute or are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1343 (Wire Fraud). The Defendant Funds is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the Defendant Funds;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the Defendant Funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: October 22, 2020

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

/s/ Dan G. Boyle
DAN G. BOYLE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, DANIEL HOCHMAN, hereby declare that:

1. I am a Special Agent of the United States Secret Service and the case agent for the forfeiture matter entitled *United States of America v. $246,000 Seized From Signature Bank Account '5022, and $41,928 Seized From Signature Bank Account '50520.*

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 21, 2020 in Los Angeles, California.

*/s/ D. Hochman*
DANIEL HOCHMAN
Special Agent
United States Secret Service